*61 OPINION OF THE COURT
Elliott Golden, J.
In this CPLR article 78 proceeding petitioners, community associations and residents of the Brooklyn Heights community, seek a judgment directing the respondents to redraw the New York City Council District lines, delineating Council Districts No. 33 and No. 38, insofar as they affect an area in Kings County bordered on the north by Old Fulton Street, on the south by Atlantic Avenue, on the east by Furman Street, and on the west by the East River, and to include that area within District No. 33.
This area, presently included within the boundaries of District No. 38, a district primarily comprised of the communities of Red Hook and Sunset Park and portions of Gowanus and Boro Park, was, prior to the recent redrawing of Council District lines, located within the district lines encompassing the Brooklyn Heights community; however, Brooklyn Heights, absent the disputed waterfront area, has now been included within the 33rd Council District.
Not in dispute is the fact that the subject waterfront area is relatively, if not totally, uninhabited, and that erected thereon are six little-used Port Authority piers (Piers Nos. 1-6) extending out into the East River, directly below the Brooklyn Heights promenade.
The respondents are the City of New York, the New York City Districting Commission, and individually named members of that commission, who are charged with the responsibility of drawing, and of having designated, the disputed district lines.*
BACKGROUND
In November 1989, the people of the City of New York approved a new City Charter. The new Charter expanded the *62 City Council from 35 to 51 seats, and accelerated the next City Council election from the regularly scheduled date of 1993 to 1991. The new Charter also established and gave to the respondent New York City Districting Commission the job of dividing New York City into districts for the election of members to the newly enlarged Council in accordance with certain criteria set forth in New York City Charter § 52 (1).
After the requirement of one person-one vote, the section directs the Commission to give the greatest weight to insuring the fair and effective representation of the racial and language minority groups protected by the Federal Voting Rights Act. It thereafter directs that district lines "keep intact neighborhoods and communities with established ties of common interest and association, whether historical, racial, economic, ethnic, religious or other.” Other criteria follow dealing with subjects relating to the compactness and width of districts, a prohibition against crossing borough or county boundaries or separating geographic concentrations of voters of the same political party so as to diminish their political effectiveness.
Additionally, the Charter provides that these criteria "shall be applied and given priority in the order in which they are listed.” Accordingly, the requirement of population equivalence among the districts takes precedence over the requirement of fair and effective representation of minority groups, which takes precedence over the requirement of neighborhood integrity, which takes precedence over the remaining criteria.
In their answer to the petition the respondents give insight into the districting process which followed approval of the new Charter:
" 'The charter required the Commission to use the results of the 1990 census * * * After the Commission received the 1990 census figures in March 1991, its staff proceeded to identify clusters of minority populations in the City. Among other things, this analysis showed that it would be more difficult to draw districts in which Latinos predominate, because the Latino population is relatively more dispersed through the City.
" 'After identifying the locations of the racial and language minority population groups, the Commission endeavored to draw district lines that would include sufficient proportions of these groups, within the constraint of equal population, to insure the fair and effective representation to the racial and language minority groups protected by the Federal Voting Rights Act.
*63 " 'The Commission * * * issued for comment and held public hearings on an initial plan, issued May 1, 1991 * * * and a revised plan, issued May 16, 1991 * * * In response, the Commission heard, among other things, objections from representatives of the City’s Latino minority to both the initial and the revised plan. In its continuing work, the Commission sought to meet these objections.
" 'On June 3, 1991, the Commission published its final plan. It became final on June 7, 1991, when the Commission filed the plan with the City Clerk.’ ”
Thereafter, the plan was submitted to the United States Department of Justice for approval under the preclearance requirements of section 5 of the Voting Rights Act of 1965 (42 USC § 1973c). Certain objections to the plan required subsequent modifications, and on July 26, 1991, the Justice Department approved the modified final plan.
THE ISSUES
Petitioners in this lawsuit challenge the Commission’s decision to place within Council District No. 38 the area of the Brooklyn waterfront just west of the Brooklyn Heights promenade. This area is in the northern part of what is known as census block No. 105 in Brooklyn, which runs along the Brooklyn waterfront from Old Fulton Street to the entrance to the Brooklyn Battery Tunnel. A census block is the smallest geographic unit of population provided by the Census Bureau.
In explaining and justifying its decision, respondents contend that "It was the uniform practice of the Commission not to split census blocks”; that the practice reflected the Charter’s direction that the Commission use the census data, "as well as the impossibility, given the short time the Commission had to complete its work, of verifying the data’s accuracy or determining the distribution of population within any of the 33,559 census blocks that cover the City.”
Respondents assert that the decision was the result of three considerations: the Commission’s determination to create a Latino majority district in District No. 38; the Charter’s requirement that each district be contiguous; and the Commission’s practice of not dividing census blocks. The Commission further determined that, although a concentration of Latinos lived in the Sunset Park section of Brooklyn, it was not alone large enough to make a Latino majority possible. Accordingly, *64 to enhance the District’s Latino population, the Commission added to District No. 38 a noncontiguous pocket of 18,761 people, of whom 45.71% were Latino, and took out of the district other census blocks with few Latinos. Furthermore, so as to comply with Charter § 52 (2), which requires that each council district be "contiguous,” the Commission strung together 11 census blocks, forming an arc around the western edge of Council District No. 39. Census block No. 105 is one of the 11 blocks used to connect the two noncontiguous parts so as to create District No. 38.
Notwithstanding the fact that only that portion of census block No. 105 which is south of Atlantic Avenue was needed to make the connection, the Commission put the entirety of census block No. 105 into District No. 38, including the part just west of and below the Brooklyn Heights promenade.
It is respondents’ contention that petitioners fail to demonstrate a viable cause of action in that the Commission’s mandate under the Charter "concerned people, not places,” and that the Commission’s decision was neither arbitrary nor capricious nor made in bad faith.
Petitioners, on the other hand, urge that the Commission’s determination is in violation of the provisions of the City Charter in that it fails to maintain the integrity of Brooklyn Heights as a neighborhood and community by excluding the disputed waterfront area and piers, and that, as such, the refusal, merely as a matter of policy and convenience, to divide census block No. 105, is unlawful, arbitrary and capricious. Petitioners contend that in the absence of factors requiring overriding consideration being given to higher ranking criteria as provided for in the Charter, matters of policy and convenience must give way to the Charter mandate to "keep intact neighborhoods and communities with established ties of common interest and association”. (NY City Charter § 52 [1] [c].)
Furthermore, petitioners contend the Commission’s objective to create within District No. 38 a strong Latino voting block is in no way frustrated or impeded by the requested modification of the Council District lines.
Contrary to the respondents’ assertion that the Commission’s mandate under the Charter "concerned people, not places”, the petitioners strongly assert that this proceeding "is about a neighborhood — Brooklyn Heights — that has been in existence for longer than our Nation. It is a neighborhood, *65 that during its entire existence, has been defined to a significant extent by its relationships to its waterfront.”
As the respondents have given insight into the districting process which resulted in the Commission’s determination, so too have the petitioners given insight into the unique relationship between the people of Brooklyn Heights, its heritage, and its waterfront, in the form of supporting affidavits, references and exhibits which, in summary, reveal that:
"Brooklyn Heights was founded by Dutch settlers in 1636. The earliest homes in the neighborhood were built on the waterfront so that residents would have easy access to the series of famous ferries that ran between Brooklyn and Manhattan beginning in 1642.”
"Merchants and sea captains whose livelihood depended upon the waterfront maintained homes in Brooklyn Heights, and many such homes were connected directly to the waterfront by tunnels and stairways.”
"George Washington’s brilliant and crucial retreat from his Brooklyn Heights headquarters in the first year of the Revolution — an event that historians have likened, both in logistics and in military importance, to the much later British evacuation of Dunkirk — took place from the waterfront at Brooklyn Heights. History records that the Continental Army — like the later British Army — lived to fight another day because of its tactical retreat from Brooklyn Heights.”
"General Washington’s namesake, Washington Roebling, with his wife Emily, supervised the completion of the Brooklyn Bridge from Brooklyn Heights.”
"When Robert Moses’ plan for the Brooklyn-Queens Expressway threatened to cut Brooklyn Heights off from the waterfront, neighborhood residents mustered themselves to prevent it from happening * * *
"tourists, filmmakers and artists from around the world are drawn to Brooklyn Heights to view the waterfront and Manhattan from the Promenade. Indeed, the waterfront area at issue in this proceeding is zoned as part of the SV-1 Brooklyn Heights Scenic View District.”
"The Brooklyn Heights Association — a petitioner here — has had a standing committee on waterfront issues for over 20 years, and — along with other civic organizations — has invested significant time, energy and money in planning the future of the waterfront.”
*66 FINDINGS AND CONCLUSIONS
Petitioners’ recitation of the historical and economic ties within the Brooklyn Heights community, as well as respondents’ outline of the districting process which resulted in the determination as respects the council district boundary lines which are the subject of this proceeding, are relatively undisputed, are supported by the record, and are adopted by this court in rendering its determination.
Interwoven throughout these proceedings are arguments and submissions by counsel for both sides as respects the potential ability of the effected communities, and of their local officials, to influence land use decisions concerning the future development of the subject waterfront area. References are made to the political power that may enure to and be exercised by the community and its elected council person in whose district that property is located. While these are realistic considerations which do come into play "in the real world” they can have no bearing on the determinations to be made herein.
In their opposition to the petition, respondents argue that the Commission’s actions, in placing the waterfront area into District No. 38, have no effect upon the ability of petitioners to elect a council person of their choice since the six piers and the adjoining waterfront areas are uninhabited, and that the Commission’s "mandate under the City Charter concerned people, not places.” They then urge that the words "neighborhood” and "community” as referred to in the relevant Charter criteria refer only to "people,” and more specifically not to the uninhabited waterfront area and piers. Petitioners dispute this narrow and restrictive definition.
As stated in Matter of Capital Newspapers v Whalen (69 NY2d 246, 251), "It is fundamental that in interpreting a statute, a court should first look to the particular words in question, being guided by the accepted rule that statutory language is generally given its natural and most obvious meaning”.
Webster’s Third New International Dictionary defines the word "neighborhood” not only in terms of "people” but also in terms of "vicinity” or "region.”
In Farnum v Burns (561 F Supp 83, 91 [1983]), the United States District Court for Rhode Island, in a case involving the reapportionment of the Rhode Island Senate, observed that a "political” gerrymander occurred when proposed districts devi *67 ated "from natural, historical, geographical and political lines * * * drawn for a specific political purpose”. The court went on to comment that the combining of certain districts was "illogical because it ignores well recognized neighborhood lines”, and it adopted a definition of a "neighborhood” as " 'a specific territorial group. [It is] specific in the sense of physical identity of the area, and specific in the sense of social cohesiveness of the population in that area’ ” (supra, at 88) — a definition which this court adopts as well herein.
Respondents’ assertion, that the mandate of the City Charter to be followed by the Commission concerned only people and not geography, is shallow and is further belied by the very requirements that each district be "contiguous” (NY City Charter § 52 [2]) and by requirements relating to the compactness and width of districts (NY City Charter § 52 [1] [d]), adherence to borough or county boundaries (NY City Charter § 52 [1] [e]) and the length of such boundaries (NY City Charter § 52 [1] [g]).
Respondents’ purported justification for the inclusion within District No. 38 of the entirety of census block No. 105, to wit: the Commission’s policy not to split census blocks, coupled with the convenience it afforded is, in this court’s view, inadequate, and demonstrates a cavalier and arbitrary approach to its responsibility under the Charter.
Nowhere is it claimed that the splitting of census blocks is impermissible by virtue of any statute, rule or regulation. Additionally, in appropriate situations, courts have approved voting plans wherein certain voting districts and census blocks were split (see, Farnum v Burns, supra, at 90; see also, Broad Channel Civic Assn. v New York City Districting Commn., Sup Ct, NY County, index No. 18756/91, decision and order filed Aug. 15, 1991).
Given the historic and unique relationship between the Brooklyn Heights community and its waterfront; the fact that census block No. 105 contains no voting population and if split could still be used to help fashion a land bridge consistent with the Commission’s desire to create within District No. 38 a Latino majority; and that the highest ranked applicable mandate of Charter § 52 (1) required that neighborhoods and communities with established ties of common interest and association be kept intact; the failure of the Commission to split census block No. 105 at Atlantic Avenue was improper and consequently established a district boundary which is in *68 conflict with the intent of the Charter’s provisions. Policy and convenience must be subordinated to the Charter’s clear mandate; the failure to do so was unwarranted, arbitrary and capricious.
piers nos. 1-6
Petitioners also seek to place within Council District No. 33 the six piers (Piers Nos. 1-6) that are connected to the land just west of the Brooklyn Heights promenade. They are part of a series of piers adjacent to the Brooklyn Heights and Red Hook areas which extend out from the shoreline into the East River.
These piers, commonly referred to as "The Brooklyn Piers” are, no doubt to the bewilderment and disillusionment of any inveterate Brooklynite, located in Manhattan.
The respondents in their answer to the petition herein explain:
"All ten piers are in New York County, the county line being at the low-water mark on the shore of Long Island. See New York City Administrative Code, §§2-202 (1) & (3) * * * The line had been fixed by 1882. L. 1882, ch. 410, § 1. * * *
"In the final 1991 districting plan based on the 1990 census data, all ten piers are in Council District #1 in Manhattan. The common metes and bounds segment between District #1 in Manhattan and District #38 in Brooklyn is the New York-Kings County boundary.”
Piers Nos. 1-6 match census blocks Nos. 908, 909, 910, 911, 912 and 913, respectively. The 1990 census recorded no population for these census blocks.
What then was the rationale for placing these six piers in Manhattan Council District No. 1, especially in light of the Charter’s mandate that district lines should keep neighborhoods and communities intact? It was, we are told by respondents, a decision made by an unknowing computer: "The placement of the piers in District #1 in Manhattan was a technical matter. The Commission did not discuss it, or consider an option of locating the piers in Brooklyn. The computer that drew the metes and bound of the district, absent instruction to do otherwise, followed county boundaries.”
While Charter § 52 (1) (e) seeks to inhibit districts from crossing borough or county boundaries, that criteria is subservient to section 52 (1) (c) requiring the preservation of neigh *69 borhood integrity. Furthermore, authorization is specifically given in section 52 (3) to include within a district territory located in two boroughs, under circumstances such as are present herein. Accordingly, the placement of the six piers into Manhattan Council District No. 1 was done arbitrarily and without any decision, much less any rational decision, by the Commission, and is in violation of the City Charter provisions.
While the court has little mechanical problems in fashioning Council District lines as respects the northerly, southerly, or easterly boundaries for the disputed area, customary and accepted principles allowing for a metes and bounds description utilizing a fixed point of reference such as a monument, natural boundary, street or highway, do not readily apply if the westerly boundary is to be beyond the shoreline. The existing piers extending into the waterway could be altered, destroyed, or removed and do not constitute a reasonably fixed point of reference. None of the parties suggest any alternatives; however, an examination of the record herein reveals the existence of a United States pierhead line — a line established and approved by the Federal Government which roughly follows and parallels the shoreline to the west thereof at a distance away from the shoreline which approximates the length of the existing pier projections.
Pierhead lines are an acceptable point of reference for a metes and bounds description, and are in fact utilized in Administrative Code of the City of New York § 2-202 which designates the five boroughs and the boundaries thereof.
JUSTICE DEPARTMENT PRECLEARANCE
Raised for the first time at the argument of this petition is the issue of whether this court can change the present council district lines without obtaining further preclearance from the United States Department of Justice in conformity with section 5 of the Voting Rights Act. Because Bronx, Kings and New York Counties are political subdivisions subject to section 5 preclearance requirements, same was sought and ultimately obtained as a prerequisite to implementation of the final redistricting plan — the plan which this proceeding seeks to modify.
It is this court’s determination that section 5 of the Voting Rights Act does not require further preclearance by the Justice Department as a prerequisite to granting the petition *70 herein. As stated by the United States Supreme Court in East Carroll Parish School Bd. v Marshall (424 US 636, 638-639, n 6): "In any event, we agree * * * that court-ordered plans resulting from equitable jurisdiction over adversary proceedings are not controlled by § 5.” (See also, Connor v Johnson, 402 US 690.)
Furthermore, in Hathorn v Lovom (457 US 255 [1982]) the court held that State courts may properly decide Voting Rights Act issues that arise collaterally in actions initially commenced under State law. It should additionally be remembered that the disputed waterfront area and piers are virtually unpopulated, and that no voting rights would be affected, denied or abridged because of such a change.
CONCLUSION
By virtue of the foregoing, the petition herein is granted and the respondents are forthwith directed to redraw the New York City Council District lines as respects Brooklyn Districts No. 33 and No. 38, and Manhattan District No. 1, so as to include within Brooklyn District No. 33 the area bordered on the east by Furman Street; on the west by the United States pierhead line; on the north by Old Fulton Street as extended by a straight line continuing westward until its intersection with the said pierhead line; and on the south by Atlantic Avenue as extended by a straight line continuing westward until its intersection with said pierhead line.

 The New York City Board of Elections was originally included as a respondent herein, but, by stipulation, the proceeding against it has been discontinued. It appears that the role of the Board of Elections as respects such district lines is primarily related to the proper supervision of elections within the districts established, rather than the establishment of such districts. However, the court is compelled to observe that the Council District maps prepared by the Board of Elections and, sua sponte, obtained by the court for its own guidance, do not accurately reflect the existing district lines for Council Districts Nos. 33, 38 and 39, as promulgated by the respondent Commission. Curiously, however, these Board of Elections maps in large measure reflect the petitioners’ assertions that the waterfront property and piers are includable within the 33rd Council District.