221 A.2d 799.

OPINION TO THE GOVERNOR.

JULY 18, 1966.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

OPINION of justices rendered to governor relative to constitutionality of legislation establishing electoral districts for election of senators and representatives in the general assembly.

July 18, 1966

To His Excellency, John H. Chafee
  Governor of the State of Rhode Island
    and Providence Plantations

We have received from Your Excellency, pursuant to the provisions of article XII, section 2, of amendments to the constitution of this state, a request for our written opinion concerning the constitutionality of legislation enacted by the general assembly establishing electoral districts for the election of senators and representatives in the general assembly. The legislation to which the questions refer is P. L. 1966, chap. 115, which purports to establish electoral districts for the election of senators in the general assembly, and P. L. 1966, chap. 116, which purports to establish electoral districts for the election of representatives in the general assembly.

The questions propounded are five in number. A copy thereof is attached to this opinion and designated as Appendix A. Questions 1 and 4 inquire as to the constitutionality of the legislation above referred to in the light of the provisions of art. XIX and art. XIII of amendments to the constitution of this state requiring that such electoral districts, among other things, be "as compact in territory as possible." Questions 3 and 5 inquire as to whether the

provisions of said chap. 115 and chap. 116 are unconstitutional as violative of the equal protection clause of the fourteenth amendment to the United States Constitution. Question 2 inquires whether the provision of chap. 115 establishing fifty such senatorial districts for the election of senators in the general assembly violates the provisions of art. XIX of amendments to the constitution of this state and the formula therein which provides for a maximum of forty-six senators as constituting that body.

At the threshold of this discussion we note our conclusion that the provisions of arts. XIII and XIX of amendments to the state constitution requiring territorial compactness in the structuring of electoral districts were not invalidated by our decision in *Sweeney* v. *Notte*, 95 R. I. 68. It is true that in context the provisions for territorial compactness relate to the structuring of electoral districts within those municipalities of the state that prior to that decision were entitled to more than one representative. However, we are of the opinion that the framers of the constitution, in providing that such districts be territorially compact, intended that it apply to any districts the legislature might from time to time have authority to establish. To hold to the contrary would be to deny vitality to the constitution.

We note also that this provision of arts. XIII and XIX confers no power on the legislature to establish electoral districts but is a limitation on the power to so act already possessed by the legislature. In *Payne & Butler* v. *Providence Gas Co.*, 31 R. I. 295, we recognized that state legislatures possess plenary power in the legislative area except as the same may be limited by the Constitution of the United States or the constitution of this state. In other words, the legislature of this state would have plenary power to provide for election machinery, including the establishment of electoral districts, but for the restrictions

thereon set out in arts. XIII and XIX. In short, we are concerned here with a determination of the extent to which the broad power of the legislature to structure electoral districts is circumscribed by that provision of arts. XIII and XIX requiring that each such district territorially be "as compact in territory as possible."

The questions propounded by Your Excellency refer only to the constitutional requirement for territorial compactness in the structuring of these districts. From this we conclude that your questions posit substantial compliance with the requirement therein contained for numerical equality and we are asked to determine only whether there has been compliance with the further requirement for territorial compactness contained in these articles. This we are asked to do on the basis of two maps submitted to us by Your Excellency and by such matters relating to the population of the state and its geographical features as may be within our judicial knowledge.

The term "compact" has no precise or exact meaning within the context of the constitutional mandate to divide the state into districts which shall be "as compact in territory as possible." *County of Norfolk* v. *City of Portsmouth*, 186 Va. 1032. While a division into tightly packed districts with regular lines might literally satisfy the constitutional requirement, our state with its irregular boundaries, its bays and its inlets, its islands, its rivers and lakes and its many other geographical features is obviously not susceptible to being divided into circular planes or squares. Moreover, the overriding requirement that the districts must be as nearly equal in population as possible would prevent the accomplishment of any such division.

The term "compact" then, as it is used in the constitution, has reference to a principle, rather than to a definition, and has meaning only within an appropriate factual context. Its origins as a constitutional requirement lie in

an intention to provide an electorate with effective representation rather than with a design to establish an orderly and symmetrical geometic pattern of electoral districts. Undoubtedly a principal inducing factor for its adoption was the desire to avoid the political gerrymander. There was then, as there is now, a recognition that the structuring of electoral districts containing equal numbers of people or voters, standing alone, would not necessarily insure effective participation in representative government.

Long experience disclosed then, as it does now, that in a democracy the political party is an essential part of the mechanism providing for full political equality. That political equality may be nullified or neutralized, however, if the electoral districts are so structured that voter groups are excluded and the election of candidates of one party or the other thus insured. To redistrict for such purpose has long been recognized as being a politically reprehensible practice and on occasions has been held to be legally impermissible. It is known by the generic name of the political gerrymander. It is effected by a delineation of the boundaries of electoral districts in such a manner as to exclude therefrom, or to include therein, groups of voters whose political affinities may reasonably be surmised and whose political action is reasonably predictable. The delineation is usually without reference to physical features of the area that normally would induce regularity in configuration and bears no rational relationship to historical, natural and political boundary lines which normally would be relevant in the structuring of such districts.

That the political gerrymander was an evil which a constitutional requirement of compactness was designed and intended to eradicate was recognized in *Preisler* v. *Doherty,* 365 Mo. 460, where at page 471 the court said: "Certainly the framers of the Constitution did not intend for senatorial districts to be laid out according to the free will and

caprice of the officers charged with that duty. The requirements of contiguity and compactness were placed there for a purpose. Our original Constitution of 1820 did not contain them. * * * No doubt they were found to be necessary to the preservation of true representative government * * *. It has been stated that the purpose of these requirements was 'to guard, as far as practicable, under the system of representation adopted, against a legislative evil, commonly known as the "gerrymander," and to require the Legislature to form districts, not only of contiguous, but of compact or closely united, territory.' "

At least implicit recognition also came from the Supreme Court in *Reynolds* v. *Sims*, 377 U. S. 533, when at page 578 it said:

> "A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering."

Clearly any deviation from contiguity and from natural, historical, geographical, and political lines for the purpose of achieving a political gerrymander is constitutionally prohibited by the mandate of compactness. This is not to say that departures from those criteria in order to accomplish a racial or an ethnic gerrymander or to insure as far as possible the reelection of an incumbent, or to make inconvenient or impractical an exercise of the franchise, are not also prohibited.

In short, if the objective of compactness is to be attained the deviations must be explainable by rational and legitimate considerations; they must be in good faith; and they must be justifiable upon grounds which in another context the Supreme Court in *Roman* v. *Sincock*, 377 U. S. 695, 710,

said "are free from any taint of arbitrariness or discrimination."

We address ourselves then to the narrow issue of whether the electoral districts established by chaps. 115 and 116 or any of them, by reason of having been delineated in irregular form or without regard to existing municipal boundaries, constitute a violation of the provisions for compactness set out in arts. XIII and XIX. The framers of the constitution, in requiring territorial compactness, clearly intended to leave the legislature with a wide discretion as to the territorial structuring of the electoral districts. The phrasing of the constitutional limitation suggests this in that it requires the districts to be territorially as compact *as possible*. The phrasing of the constitutional limitation discloses a recognition of the legislative character of the determinations that must be made to establish the factors that govern the structuring of electoral districts so as to insure voting equality therein.

We are persuaded then that the requirement for territorial compactness in the circumstances was intended to be peripheral in its thrust and to leave to the legislature the question of determining the territorial structuring that will provide districts as compact as possible. In short, whether there has been a complete departure from the requirement for compactness is a judicial question, but the determination of the territory that necessarily would have to be included in a district to provide that that district be as compact *as possible* is for legislative determination. In *People ex rel. Woodyatt* v. *Thompson,* 155 Ill. 451, the court noted at page 480: "There is a vast difference between determining whether the principle of compactness of territory has been applied at all or not, and whether or not the nearest practical approximation to perfect compactness has been attained. The first is a question which the courts may finally determine; the latter is for the legislature."

The conclusion of law that must be reached in order to hold that the legislative structuring of the electoral districts violates the compactness requirement of the constitution is that it acted without a rational or legitimate basis. That chaps. 115 and 116 are free from the taint of arbitrariness and discrimination and whether in enacting those chapters the legislature acted in good faith and upon legitimate considerations are issues which we are unable to determine solely on the basis of the maps submitted to us and such other facts as we can with propriety judicially notice. While by possibility it may be that the redistrictings provided for in chaps. 115 and 116 are without rational or legitimate bases, a determination to that effect necessarily requires a resort to the fact-finding process. It is settled, however, that we will not exercise that process for purposes connected with our constitutional obligation to furnish advisory opinions under the provisions of sec. 2 of art. XII of amendments requiring the justices to furnish advisory opinions.

In *Opinion to the Governor,* 96 R. I. 358, referring to the obligation of this court to furnish advisory opinions, we said at page 364: "Our conclusion that the constitutional requirement does not apply to inquiries that can be answered only through an exercise of the fact-finding power by this court follows necessarily from the fact that under the pertinent provisions the judges of this court act as individuals and not as the judicial department of the state government. *Opinion to the Governor,* 89 R. I. 329, 332. It is obvious that the judges, when acting as individuals, are without power to determine facts either on the evaluation of evidence or by way of evidentiary presumption. That power inheres in the court as the judicial branch of the state government, and it may not be exercised by judges when acting as individuals pursuant to the provisions of sec. 2 of art. XII of amendments."

The circumstances here are such then that we are unable to conclude as a matter of law that the provisions of chaps. 115 and 116 establishing electoral districts violate the requirement for territorial compactness stated in arts. XIII and XIX of amendments to the constitution of this State. Pursuant to our practice, this being so, we can only direct Your Excellency's attention to the general view that in such circumstances the legislation must be deemed to be presumptively constitutional.

Questions 3 and 5 inquire whether the provisions of chaps. 115 and 116 violate the provisions of art. XIV of amendments to the Constitution of the United States "as interpreted by the United States Supreme Court in *Baker* v. *Carr*, 369 U. S. 186 (1962), *Reynolds* v. *Sims*, 377 U. S. 533 (1964), and decisions following these cases." We know of no case in which the Supreme Court of the United States has considered and passed upon the precise question whether a political gerrymander violates the equal protection provisions of the fourteenth amendment to the federal Constitution. In *WMCA, Inc.* v. *Lomenzo*, 238 F. Supp. 916, a three-judge court, considering, among other things, a contention that a plan for the reapportionment of New York State violated the fourteenth amendment in that it gerrymandered the state for partisan political advantages, appears to have held that while gerrymandering based on race, color, and so forth may violate the fifteenth amendment to the Constitution, political gerrymandering in itself does not violate the fourteenth amendment.

The Supreme Court in *WMCA, Inc.* v. *Lomenzo*, 382 U. S. 4, 15 L. ed. 2d 2, in a per curiam decision affirmed the holding of the three-judge court. In a concurring opinion Mr. Justice Harlan said that the three-judge court, in passing on the issue raised, "rejected contentions that apportioning on a basis of *citizen* population violates the federal Constitution, and that partisan 'gerrymandering' may be subject to

federal constitutional attack under the Fourteenth Amendment. In affirming this decision, this Court necessarily affirms these two eminently correct principles." Despite the ambiguity of the language of Mr. Justice Harlan it may well be that the court, in affirming the decision of the three-judge court in the above case, intended to hold that political gerrymandering is not within the scope of the fourteenth amendment. In *Fortson* v. *Dorsey*, 379 U. S. 433, 439, however, the Supreme Court, speaking through Mr. Justice Brennan, said: "It might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population. When this is demonstrated it will be time enough to consider whether the system still passes constitutional muster. This question, however, is not presented by the record before us." Whether the language of the learned Justice is significant that political gerrymandering, when presented as an issue in appropriate circumstances, is within the scope of the fourteenth amendment is not for us to decide.

However, in our opinion no useful purpose would be served by an extended discussion of the question whether the equal protection clause of the fourteenth amendment inhibits a districting that constitutes political gerrymandering, this for the reason that in the instant case whatever might be our conclusion as to the law, there are before us no facts to which we could apply that conclusion. Therefore, we respectfully decline to answer questions 3 and 5.

In question number 2 our attention is directed to the provisions of art. XIX establishing a formula that appears to provide for a senate consisting of forty-six members. The question goes to the constitutionality of the division of the state into fifty senatorial districts under

chap. 115 in view of the formula thus set out in art. XIX. It is to be noted that the formula does not expressly require the establishment of a senate of forty-six members in terms that require the legislature apportioning the senate to allow one member for each city and town in the state and provides further "that any town or city having more than twenty-five thousand qualified electors shall be entitled to an additional senator for each additional twenty-five thousand qualified electors, always allowing one additional senator for a fraction exceeding half the ratio; but no town or city shall be entitled to more than six senators."

In *Sweeney* v. *Notte*, 95 R. I. 68, this court considered the binding effect of a similar formula set out in art. XIII providing that the membership of the house was not to exceed one hundred, allowing one representative to each municipality, and providing that no municipality should be allowed more than one fourth of the whole membership. There we held that strict compliance with this formula would result in a denial of equal protection of the law within the meaning of that phrase as used in the fourteenth amendment to the federal Constitution. The effect of this ruling then was to hold that the formula in its entirety was offensive to the equal protection clause under the rule laid down in *Baker* v. *Carr*, 369 U. S. 186.

Were the legislature to conform to the formula set out in art. XIX and allow each municipality one senator, it is obvious that compliance with the requirement that an additional senator be allowed each city or town, the population of which exceeded twenty-five thousand, would result in invidious discrimination in voting equality. Again, were the legislature to ignore the ratio of twenty-five thousand in the allowance of additional senators and establish a ratio that was equal to the electorate of the smallest town in the state, the limit of six senators allowable to any given city or town would violate the equal protection clause

of the fourteenth amendment. In our opinion then it follows that compliance with the formula provided for in art. XIX in apportioning the membership of the senate must result in a denial of equal protection under that amendment, and it must fall.

Whether the legislature, by compliance in part with the provisions of the formula, could apportion the senate in a manner not violative of the equal protection clause is without significance here. The controlling fact is that compliance with the formula in its entirety as set out in art. XIX would of necessity produce a malapportionment of that body. In *Sweeney* v. *Notte, supra,* we conceded that the legislature might comply in part with the formula restricting their power to apportion the house. We must concede also that it was within the legislative discretion to exercise its power to apportion in partial compliance with art. XIX. In short, compliance with the formula in part to the contrary notwithstanding, the legislature was acting within its plenary power to apportion that body and the division of the state into fifty senatorial districts does not violate art. XIX of the amendments to the constitution of this state as it must be construed in the light of *Reynolds* v. *Sims,* 377 U. S. 533. We, therefore, answer question number 2 in the negative.

Thomas H. Roberts
Thomas J. Paolino
William E. Powers
Alfred H. Joslin
Thomas F. Kelleher

## APPENDIX A

1. Is Chapter 115 of the Public Laws of 1966 or any part thereof, in violation of the provisions of Article XIX of the Amendments to the Rhode Island Constitution, and in particular with the requirement set forth in that article that senatorial districts be "as compact in territory as possible"?

2. Is Chapter 115 of the Public Laws of 1966 providing for 50 senatorial districts in violation of the provisions of Article XIX of the Amendments to the Rhode Island Constitution, wherein the apportionment formula provides for 46 senators?

3. Is Chapter 115 of the Public Laws of 1966 or any part thereof, in violation of Article XIV of the amendments to the United States Constitution, as interpreted by the United States Supreme Court in *Baker* v. *Carr*, 369 U. S. 186 (1962), *Reynolds* v. *Sims*, 377 U. S. 533 (1964), and decisions following these cases?

4. Is Chapter 116 of the Public Laws of 1966 or any part thereof, in violation of Article XIII of the Amendments to the Rhode Island Constitution, and in particular with the requirement set forth in that Article that representative districts be "as compact in territory as possible"?

5. Is Chapter 116 of the Public Laws of 1966 or any part thereof, in violation of Article XIV of the amendments to the United States Constitution, as interpreted by the United States Supreme Court in *Baker* v. *Carr*, 369 U. S. 186 (1962), *Reynolds* v. *Sims*, 377 U. S. 533 (1964), and decisions following these cases?