John A. HOLMES, Jr., et al.

v.

Susan L. FARMER et al.

No. 83–149–Appeal.

Supreme Court of Rhode Island.

April 10, 1984.

978

Max Wistow, John P. Barylick, Wistow, Barylick & Bruzzi Incorporated, Providence, for plaintiffs.

Peter J. McGinn, Normand G. Benoit, John M. Boehnert, Tillinghast, Collins & Graham, Providence, for defendants.

## OPINION

SHEA, Justice.

This is an appeal by the plaintiffs [1] from a judgment of the Superior Court dismissing their complaint challenging the constitutionality of the legislation reapportioning and redistricting the Rhode Island Legislature, specifically the House of Representatives.

The plaintiffs claimed that the reapportionment plans violated the Rhode Island Constitution's requirement of compactness; that the plans violated the equal-protection clauses of the United States' and Rhode Island's Constitutions because of population inequality among the districts; that certain defendant legislators engaged in an unlawful civil conspiracy to deprive voters of their right to equal protection; that the plans were gerrymandered to serve political purposes and to dilute the voting strength of women and various racial, ethnic, religious, and political groups; and that the plans violated the Rhode Island constitutional requirement of partial compliance with the municipal-representation apportionment formulae. The plaintiffs sought a declaratory judgment, injunctive relief, and a court-ordered redistricting plan.

The case was originally consolidated with *Licht v. Quattrocchi* (No. 82–1494 R.I. Superior Court—a suit challenging the redistricting of the Senate), concerned with the validity of the Senate redistricting. The issues concerning the redistricting of the House of Representatives (House plan) were specifically severed. The trial court ruled that the Senate plan was unconstitutional, and this court upheld that judgment. *Licht v. Quattrocchi,* R.I., 449 A.2d 887 (1982).[2] This appeal involves only the validity of the House plan.

---

1. The plaintiffs in this case are John A. Holmes, Jr. (substituted individually as party plaintiff for the Rhode Island Republican Party); Senator Lila M. Sapinsley; and Representative Norma B. Willis. The defendants originally were Speaker of the House Matthew J. Smith; Representatives Zygmunt J. Friedemann and Joseph DeAngelis; Senators Rocco Quattrocchi and William A. Castro; Secretary of State Robert F. Burns; and the Rhode Island State Board of

Elections. Because the complaint against the individual legislators was dismissed below and Susan L. Farmer succeeded Robert F. Burns as Secretary of State, the case is now captioned *Holmes v. Farmer.*

2. The case was subsequently dismissed (*Licht v. Quattrocchi,* R.I., 454 A.2d 1210 (1982)) as moot because a three-judge federal court had assumed jurisdiction over the issues involved in the Sen-

The claims against the individual House defendant legislators were dismissed prior to trial because of their immunity from civil suit. The plaintiffs made various other motions for summary judgment and dismissal, but the court declined to rule on these during trial.

Evidence described as highly technical by the trial justice was presented by experts throughout the three-week trial along with approximately forty exhibits. During trial plaintiffs called the consultant to the General Assembly's Reapportionment Commission and various state legislators to testify concerning the formation of the House plan. The trial justice ruled this testimony inadmissible on the grounds of privilege and relevance.

On the basis of evidence presented, which the trial justice found credible, the following facts were found.

According to the 1980 census, the population of the State of Rhode Island was 947,-154; therefore, the ideal district population for each of the 100 House districts was 9,472.

The cities of Providence and Newport contained, under the 1974 House districting, districts or portions of districts that comprised population in numbers that exceeded the number of seats to which these cities would now be entitled if their populations were divided by the ideal district population. Between the 1970 and the 1980 censuses, Newport lost 15.3 percent of its population, the adjoining town of Middletown lost 41.2 percent of its population, and the town of Jamestown grew 38.8 percent in population, all of which changes necessitated substantial alterations in district lines.

Prior to the 1982 Reapportionment Act, one House district, No. 45, was overrepresented by 64 percent and another district, No. 58, was underrepresented by 69 percent. In the House plan enacted, the total maximum deviation, which is the sum of the percentage deviations of the most underrepresented and the most overrepresented districts, is 11.5 percent, or 1,090 people. The major reason for this particular deviation is a population disparity in the plan between district 24, which is overrepresented by 5.827 percent, and district 25, which is underrepresented by 5.679 percent. This particular disparity, evidence established, resulted from a mathematical error in drawing the boundary lines between districts 24 and 25. Without this error, the total maximum deviation of the House plan, excluding the two districts, would be 5.4 percent, or 518 people. The average deviation overall in the House plan is 1.9 percent, or 180 people, and the median deviation in the plan is 2.1 percent, or 199 people. If one excludes districts 24 and 25, the formation of which, as we have said, resulted from a mathematical error, no district in the plan deviates more than 2.7 percent from the ideal. Forty-five of the districts have deviations of less than 2 percent, and nineteen of the districts in the plan have deviations of less than 1 percent.

Between the 1970 census and the 1980 census, the population of Rhode Island decreased by .3 percent, or 2,569 people. Also, 129,980 people shifted from district to district within the state between the time that the then-existing House district lines were created in 1974 and the time the 1980 census was conducted. When the General

ate redistricting controversy. *Farnum v. Burns,* 561 F.Supp. 83 (D.R.I.1983). The decision of the three-judge federal court in *Farnum* invalidated the Senate plan as violative of the nineteenth amendment of the Rhode Island Constitution and ordered state officials to comply with the court's order. We note, however, the recent decision of the United States Supreme Court in *Pennhurst State School & Hospital v. Halderman,* — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), in which it was held that a federal court

is prohibited from ordering state officials to conform with state law ("* * * it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* at —, 104 S.Ct. at —). Consequently, the order of the three-judge federal court may have been void for lack of subject-matter jurisdiction.

Assembly was reapportioned in 1982, 76.8 percent of the population within the State carried over within the same districts.

The number of crossings of municipal boundaries involved in the House plan is seventy-four. The plaintiffs' proposed reapportionment plan would have contained sixty-eight municipal boundary crossings.

The evidence established that there are twenty-five recognized neighborhoods within the city of Providence. Consequently, the division of Providence into eighteen representative districts or parts of districts necessitated a substantial number of crossings of neighborhood lines. The court also found that there are approximately twenty recognized neighborhoods within the city of Newport.

The court found that district 98 in the House plan enacted comprises the island of Jamestown and part of the city of Newport, which are contiguous on a shore-to-shore basis by virtue of the Newport Bridge.

The percentage of black population in the Providence districts remained substantially unchanged in the 1982 reapportionment. The districts in the 1982 House plan contain districts that range in black population from 9.62 percent to 44.47 percent. The court ruled that the evidence did not demonstrate minority-voter dilution but rather that the plan preserves the political strength of minorities in Providence and Newport. This ruling has not been appealed by plaintiffs.

The trial justice dismissed plaintiffs' complaint and upheld the validity of the House reapportionment plan.

The plaintiffs raise five issues, three of which we deal with here:

1. Whether the trial justice correctly upheld the legislators' and their aide's invocation of the privilege contained in the speech in debate clause.

2. Whether the House plan violates the Rhode Island constitutional requirement that districts be as compact as possible.

3. Whether there is a violation of the federal and state equal-protection clause.

We need not deal with the issues of the relevancy of the excluded testimony, nor need we deal with the trial justice's refusal to declare the reapportionment commission's consultant an adverse witness because our ruling on the first issue is dispositive of those matters.

I

LEGISLATIVE PRIVILEGE

On numerous occasions during trial, plaintiffs attempted to introduce evidence from Dr. Anthony Coelho, the legislative aide to the General Assembly's Reapportionment Commission; Speaker of the House Matthew J. Smith; Representatives Joseph DeAngelis and Zygmunt J. Friedemann; and Senator Lila M. Sapinsley, concerning the formation of the state reapportionment plan. The evidence was principally offered to show that the Reapportionment Commission used a ± 2.5 percent target deviation in drawing district lines, that the commission members were politically motivated when they decided on district boundaries, and that the members were ignorant of applicable laws by which they were required to abide.

The trial justice excluded this testimony on two grounds: (1) that under R.I. Const., art. IV, sec. 5,[3] the legislators and their aides enjoyed a constitutional privilege from testifying concerning their words and conduct in the execution of their legislative duties and (2) that the evidence was irrelevant. At first he allowed Senator Sapinsley to testify because she allegedly waived her privilege, but he later sustained defendants' objections to her testimony on relevancy grounds.

There has never been an interpretation or application of Rhode Island's "speech in

---

**3.** Article IV, sec. 5, of Rhode Island's Constitution states in part: "For any speech in debate in either house, no member shall be questioned in any other place."

debate clause" by this court.[4] In order to interpret this provision adequately, we must look at the history of this section as well as the interpretation of a similar provision in the United States Constitution (Art. I, Sec. 6).[5] We do not accept plaintiff's contention that there is a relevant difference between the federal provision ("speech or debate") and the state provision ("speech in debate").

English history provides the origin of freedom of speech for legislators. The language in both the federal and state speech in debate clause appears to be taken directly from the English Bill of Rights of 1689.[6] As the United States Supreme Court pointed out in *Kilbourn v. Thompson*, 103 U.S. 168, 202–03, 26 L.Ed. 377, 391 (1881):

> "Many of the colonies, which afterwards became States in our Union, had similar provisions in their charters or in bills of rights, which were part of their fundamental laws; and the general idea in all of them, however expressed, must have been the same, and must have been in the minds of the members of the constitutional convention."

The speech in debate clause was first recorded in 1542 in the Speaker's Petition that defined the relationship between Parliament and the Crown.[7] It had been asserted by members of Parliament, however, long before its inclusion in that document.[8] A struggle between the English Crown and Parliament for legislative independence ensued and culminated in the Glorious Revolution of 1689.[9] The English Bill of Rights was established to ensure "that the freedom of speech and debates or proceedings in Parliament ought not to be impeached or questioned in any court or place out of Parliament." [10]

The extent of the privilege was broad.

> "Thus the privilege of having their debates unquestioned, though denied when the members began to speak their minds freely in the time of Queen Elizabeth, and punished in its exercise both by that princess and her two successors, was soon clearly perceived to be indispensable and universally acknowledged. By consequence, whatever is done within the walls of either assembly must pass without question in any other place. For speeches made in Parliament by a member to the prejudice of any other person, or hazardous to the public peace, that member enjoys complete impunity." *Stockdale v. Hansard*, 112 Eng.Rep. 1112, 1156 (1839).

**4.** It has only been mentioned twice by this court, both times in passing. *Bailey v. Laurie*, 118 R.I. 184, 188–89, 373 A.2d 482, 484 (1977), and *Lemoine v. Martineau*, 115 R.I. 233, 241, 342 A.2d 616, 622 (1975).

**5.** Article I, Sec. 6, of the United States Constitution states in part: "for any speech or debate in either house, they shall not be questioned in any other place."

**6.** English Bill of Rights, 1 W & M Sess. 2, c. 2 (1689).

**7.** *See* Neale, *The Commons' Privilege of Free Speech in Parliament*, 2 Historical Studies of the English Parliament at 147–76 (Fryde and Miller 1970).

**8.** Note the case of Thomas Young in 1455, who asserted the privilege in a petition to the House of Commons, stating, "all members 'ought to have theire fredom to speke and sey in the Hous of their assemble, as to theym is thought convenyent or resonable, withoute eny maner cha-

lange, charge or punycion therefore.'" Neale, *Id.* at 154–55.

**9.** The conflict between Charles I, son of James I, and a succession of Puritan-dominated Parliaments in England led to civil war in 1642, during which Charles I was executed by the Parliamentarians. A republican regime, Oliver Cromwell's Commonwealth, lasted from 1649 until the Stuart monarchy was restored in 1660. James II's overt Catholicism and the birth of a Catholic heir united Tories and Whigs in opposition. Seven nobles invited William of Orange and his consort Mary, Protestant daughter of James, to come to England's aid. After the revolution they ruled jointly as William II and Mary II. Their acceptance of the Bill of Rights assured ascendancy of parliamentary authority over royal absolutism.

**10.** Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv.L.Rev. 1113, 1129–30 (1973); Comment, *The Supreme Court Interprets the Speech and Debate Clause*, 48 U.Cinn.L.Rev. 1015, 1017 (1979).

The speech in debate privilege first appeared in this country in state constitutions.[11] This privilege was "deemed so essential for representatives of the people that it was written into the Articles of Confederation and later into the Constitution." *Tenney v. Brandhove*, 341 U.S. 367, 372, 71 S.Ct. 783, 786, 95 L.Ed. 1019, 1025 (1951). Only four days after the Constitutional Convention opened, article V of the first draft of the United States Constitution submitted by Charles Pinckney stated that "Freedom of Speech or Debate in the legislature shall not be impeached or questioned in any place out of it."[12] The provision was adopted by the convention with virtually no debate and subsequently became Art. I, Sec. 6, of the United States Constitution.

The purpose of the speech in debate clause is to ensure the Legislature freedom in carrying out its duties. James Wilson, a member of the Committee of Detail of the Constitutional Convention, stated:

> "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence." *Tenney v. Brandhove*, 341 U.S. at 373, 71 S.Ct. at 786, 95 L.Ed. at 1025. (quoting *II Works of James Wilson* 38 (Andrews ed. 1896)).

The Constitutions of Massachusetts and New Hampshire explicitly declare that free speech and debate in the Legislature are "essential to the rights of the people." Mass. Const., pt. I, art. XXI, and N.H. Const., pt. I, art. XXX. The Massachusetts Supreme Judicial Court, in the first interpretation by a court in this country of the privilege, further highlighted its importance:

> "These privileges are thus secured, not with the intention of protecting the members against prosecutions for their own benefit, but to support the rights of the people, by enabling their representatives to execute the functions of their office, without fear of prosecutions, civil or criminal. I therefore think that the article ought not to be construed strictly, but liberally, that the full design of it may be answered." *Coffin v. Coffin*, 4 Mass. 1, 27 (1808).

This freedom ensures the separation of powers among the coordinate branches of government. Further, the fact that the legislators can carry out their duties without being questioned "in any other place" allows the free flow of debate among legislators and the maximization of an effective and open exchange of ideas.

These principles are protected by a liberal construction and strict enforcement of the speech in debate clause. As James Madison noted in Federalist No. 47:

> "It is agreed on all sides, that the powers properly belonging to one of the departments ought not to be directly and completely administered by either of the other departments. It is equally evident, that neither of them ought to possess, directly or indirectly, an overruling influence over the others in the administration of their respective powers. * * * [T]he next and most difficult task is to provide some practical security for each, against the invasion of the others." *The Federalist* 343 (Dawson ed. 1864).

"The legislative privilege * * * is one manifestation of the 'practical security' for ensuring the independence of the legislature." *United States v. Johnson*, 383 U.S. 169, 179, 86 S.Ct. 749, 754, 15 L.Ed.2d 681, 687 (1966).

We now turn to the specifics of the case before us to determine the scope of the privilege and whether it was properly ap-

---

**11.** Md. [Declaration of Rights] Code Ann. art. X (1981); Mass. [Declaration of Rights] Gen.Laws Ann. pt. 1, art. XXI (West 1978); N.H.Rev.Stat. Ann. pt. 1, art. XXX (1970).

**12.** Madison, *Journal of the Constitutional Convention* at 66 (Scott ed. 1893).

plied by the trial justice. The first issue is whether the trial justice correctly upheld the claim of privilege by Speaker Smith, Representatives DeAngelis and Friedemann, and consultant Dr. Coelho. The second issue is whether an individual legislator can waive this privilege as Senator Sapinsley purported to do and as plaintiffs claim Speaker Smith, Representatives DeAngelis and Friedemann, and Dr. Coelho did during a deposition in another case.

### A

The plaintiffs attempted to question Speaker of the House of Representatives Matthew J. Smith, Representatives Joseph DeAngelis and Zygmunt J. Friedemann, and Reapportionment Commission consultant Dr. Anthony Coelho concerning the process of reapportionment. The extent of plaintiffs' attempted questioning can be found in their depositions taken in a related case (*Licht v. Quattrocchi*, No. 82–1494 R.I. Superior Court, *aff'd*, R.I., 449 A.2d 887 (1982)), which plaintiffs presented in total as their offer of proof. The testimony that plaintiffs wished to present concerned the following matters: who hired Dr. Coelho as consultant to the Reapportionment Commission, whether a targeting specialist addressed the political reasons for particular district lines, whether any consideration was given to aligning Jamestown with a city or town on the west shore of Narragansett Bay instead of with the city of Newport, whether there was an agreement that the House and the Senate would each apportion themselves, whether the Newport Democrats "bickered" at redistricting meetings, whether the legislators had agreed to Newport's maintaining control of four seats, whether a ± 2.5 percent deviation target was used, and whether the Reapportionment Commission participated in the formation of the House plan. The plaintiffs concede that an inquiry into the "thoughts or motivations" of legislators with respect to their vote or into "legitimate legislative activity" would be protected by the speech in debate clause. They argue, however, that the evidence offered as proof was *"not* within the sphere of legitimate legislative activity." We must disagree.

 The speech in debate clause contained in Rhode Island's Constitution confers a privilege on legislators from inquiry into their legislative acts or into the motivation for actual performance of legislative acts that are clearly part of the legislative process. *See United States v. Brewster*, 408 U.S. 501, 515–16, 92 S.Ct. 2531, 2539, 33 L.Ed.2d 507, 520 (1972). Legislators should not be questioned by any other branch of government for their acts in carrying out their legislative duties relating to the legislative process. We go no further at this time than to hold that the speech in debate clause limits judicial inquiry into words or actions that are clearly a part of the legislative process.

 The scope of the privilege does not extend to actions by legislators outside the legislative process. It does not protect the political activities of the legislators, *United States v. Brewster*, 408 U.S. at 512, 92 S.Ct. at 2537, 33 L.Ed.2d at 518, nor does it protect legislators engaged in criminal activity, *Gravel v. United States*, 408 U.S. 606, 621 n. 12, 92 S.Ct. 2614, 2625 n. 12, 33 L.Ed.2d 583, 600 n. 12, *reh. denied*, 409 U.S. 902, 93 S.Ct. 98, 34 L.Ed.2d 165 (1972), even if committed in furtherance of legislative activity. *Id.* 408 U.S. at 622, 92 S.Ct. at 2625, 33 L.Ed.2d at 600. Although a legislator cannot be officially questioned outside the legislative chambers about his legislative activities, he may be asked about these acts if they are relevant to the investigation of the criminal activity of another party as long as the propriety of the legislative act itself is not questioned. *Id.* at 628, 92 S.Ct. at 2628, 33 L.Ed.2d at 604. As the United States Supreme Court noted in *Hutchinson v. Proxmire*, 443 U.S. 111, 127, 99 S.Ct. 2675, 2684, 61 L.Ed.2d 411, 426 (1979): "Claims under the Clause going beyond what is needed to protect legislative independence are to be closely scrutinized."

■ We need not reach very far into an interpretation of the speech in debate clause in order to find the excluded testimony in this case privileged. The excluded testimony of the legislators concerned the actions and motivations of the legislators and the General Assembly in proposing and passing the reapportionment plan. Inquiry by the court into the actions or motivations of the legislators in proposing, passing, or voting upon a particular piece of legislation (as plaintiffs attempted to require) falls clearly within the most basic elements of legislative privilege.

■ The privilege applies equally to legislative aides and commission staff members who are engaged in legislative activity. For the purpose of construing the privilege, legislators and legislative aides are to be " 'treated as one.' " *Gravel v. United States,* 408 U.S. at 616, 92 S.Ct. at 2622, 33 L.Ed.2d at 597.

■ In order fully to effectuate the purpose and design of the speech in debate clause, it must be construed as an immunity from suit as well as a testimonial privilege. *See United States v. Peoples Temple of the Disciples of Christ,* 515 F.Supp. 246 (D.D.C.1981). This conclusion is further supported by the plain meaning of the constitutional provision that reads: "no member shall be questioned in any other place." R.I. Const., art. IV, sec. 5.

In *Sweeney v. Notte,* 95 R.I. 68, 82–83, 183 A.2d 296, 304 (1962), this court stated that the General Assembly is required to reapportion after a census is taken, and the prevailing apportionment constitutes a denial of equal protection. Article XIII of the Rhode Island Constitution vests the General Assembly with exclusive jurisdiction to apportion the House. *Id.* at 82, 183 A.2d at 303–04. The General Assembly undertook that obligation when it passed Public Law 1980, ch. 146, art. VIII, establishing the Reapportionment Commission and subsequently amended chapters 1 and 2 of title 22.

Although it is impossible to analyze here each of the legislators' statements from their depositions, which plaintiffs offered as proof, it is apparent that the thrust of plaintiffs' questioning would have involved matters that directly relate to the legislators' motivations and actions in proposing and carrying out the House plan. The business conducted at meetings of the Reapportionment Commission, the discussions that took place among groups of individual legislators, and the actions of individuals in carrying out the reapportionment process are areas of legitimate legislative undertakings.

■ The fact that some of the meetings took place outside the State House and were not formal committee meetings does not preclude application of the privilege. At times the Legislature's business is conducted outside the four walls at the State House. The physical setting and the informality of the meeting do not impair the privilege or dilute its objective. Restrictive application of the privilege to words spoken within the walls of the State House in a formal setting would inhibit legitimate legislative activities.

■ The plaintiffs claim that evidence of the use of a ± 2.5 percent deviation target would show a "highly impermissible purpose" on the part of the legislators and therefore falls outside the privilege. "The claim of an unworthy purpose does not destroy the privilege." *Tenney v. Brandhove,* 341 U.S. at 377, 71 S.Ct. at 788, 95 L.Ed. at 1027. Legislators' testimony is privileged in order to ensure the free flow of debate within the Legislature and the separation of powers among co-equal branches of government. An inquiry into the purpose behind legislative discussions or actions would dilute the rationale for the very existence of the privilege.

**B**

The plaintiffs contend that the depositions of Smith, DeAngelis, Friedemann, and Coelho which were taken in the case involving the Senate redistricting and the asser-

tion by Senator Sapinsley constitute a waiver of the privilege. The United States Supreme Court has on three occasions declined to decide whether, on the federal level, a member of Congress or Congress as a whole can waive the privilege of the speech in debate clause. *See United States v. Helstoski*, 442 U.S. 477, 490, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12, 24 (1979); *United States v. Brewster*, 408 U.S. at 529 n. 18, 92 S.Ct. at 2546 n. 18, 33 L.Ed.2d at 527 n. 18; *United States v. Johnson*, 383 U.S. at 185, 86 S.Ct. at 758, 15 L.Ed.2d at 690–91. We must therefore turn to the purpose of the privilege in order to analyze the waiver issue properly.

The speech in debate clause has two definite purposes: first, "to preserve the constitutional structure of separate, co-equal, and independent branches of government," *United States v. Helstoski*, 442 U.S. at 491, 99 S.Ct. at 2441, 61 L.Ed.2d at 24; and second, to protect individual legislators "from executive and judicial oversight that realistically threatens to control his conduct as a legislator." *Gravel v. United States*, 408 U.S. at 618, 92 S.Ct. at 2623, 33 L.Ed.2d at 598. The privilege protects the institution of the Legislature itself from attack by either of the other co-equal branches of government. At the same time it protects the individual legislator personally from attack either by another branch of government or from a majority within the Legislature itself.

To allow the privilege to be waived would be inconsistent with these purposes. The privilege is institutional in its protection of the Legislature, ensuring the separation of powers among the co-equal branches of government. To allow an individual legislator to waive the institution's privilege would be to allow one to act on behalf of the whole in waiving the protection of a significant bulwark of our constitutionally mandated system of government. We need not address the issue of whether an individual legislator can waive the privilege when he or she is being sued or prosecuted individually. That question is not before us.

Senator Sapinsley was allowed to testify concerning the process of formation of the reapportionment plan. No actions or statements on her part were being called into question. The privilege she purported to waive protects the Legislature as an institution from judicial interference. This "waiver" by Senator Sapinsley was incorrectly allowed, and the objection of defendants should have been sustained. The same ruling holds true for the testimony of Representatives Smith, DeAngelis, and Friedemann, and Dr. Coelho. These individuals were not allowed to testify after objection by defendants. Their testimony was contained in depositions given in a related case which were received by the trial justice in an offer of proof by plaintiffs. Because of the privilege, none of the testimony as it related to legitimate legislative activities should have been introduced, and the depositions could not therefore have constituted a waiver.

II

COMPACTNESS

The plaintiffs claim that the House plan violates Rhode Island's constitutional requirement that legislative districts be "as compact in territory as possible." (R.I. Const. amend. XIII). They appear to rely on two major propositions to show a violation of the compactness requirement: an excessive number of crossings of municipal boundaries in the statewide plan and the alignment of district 98 in the town of Jamestown with a portion of the city of Newport rather than with the town of North Kingstown.

This court has stated that the intention of the compactness requirement of amendment XIII is "to provide an electorate with effective representation rather than with a design to establish an orderly and symmetrical geometric pattern of electoral districts." *Opinion to the Governor*, 101 R.I. 203, 208, 221 A.2d 799, 802 (1966). Factors other than the mere geometric shape of the particular districts are crucial because "our

state with its irregular boundaries, its bays and its inlets, its islands, its rivers and lakes and its many other geographical features is obviously not susceptible to being divided into circular planes or squares." *Id.* at 207, 221 A.2d at 802.

 Our review of the compactness requirement, however, is limited. The framers of the constitution "clearly intended to leave the legislature with a wide discretion as to the territorial structuring of the electoral districts." *Id.* at 210, 221 A.2d at 803. The phrasing of the constitutional limitation suggests this result in that it requires the districts to be as territorially compact *"as possible."* The court reviews to ensure that the Legislature did not act "without a rational or legitimate basis." *Id.* at 211, 221 A.2d at 803. The clause is violated, as the trial justice correctly stated, "only when a reapportionment plan creates districts solely for political considerations, without reference to other policies, in such a manner that the plan demonstrates a complete abandonment of any attempt to draw equal, compact and contiguous districts."

The plaintiffs claim that according to their expert's testimony the House plan contains seventy-four municipal crossings. However, there are a total of sixty-eight crossings in plaintiffs' expert's own proposed plan. This difference between the two plans is hardly sufficient to say that the Legislature acted arbitrarily when it drew the district lines. Rather, we are able to conclude from this minor variance that the Legislature was in fact careful in preserving municipal boundaries as closely as possible, considering the various other valid factors that go into the drawing of district lines.

The other facts plaintiffs point to in order to demonstrate that the Legislature did not observe the principles of compactness and contiguity are the positioning of district 98 between the city of Newport and the town of Jamestown and the "odd shape" of district 98 in Newport.

When an island is involved that does not contain enough residents to constitute a separate district, a decision must be made in respect to combining such island with a portion of the mainland. The Legislature must then look to other factors to determine where the island's interest and relationship are strongest. The trial justice considered evidence of Jamestown's ties to North Kingstown ("There is a toll free bridge to North Kingstown, its high school students are educated in the North Kingstown school system, and several other relationships create a strong link") as well as its ties to Newport ("additional fire, police and medical service is available in greater quantity from Newport; Newport has closer and larger shopping areas; and Jamestown is in Newport County, and thus served by the Family, District and Superior Courts at the county seat in Newport"). The trial justice then concluded that

> "the court could not judge that one was substantially stronger than the other. In any event, the link to North Kingstown is not sufficiently stronger than the link to Newport to warrant a judicial finding to that effect."

The trial justice was not clearly wrong in his statement and construction of the facts. His conclusion that neither tie was substantially stronger clearly leaves the decision in the hands of the Legislature, which exercised its discretion in connecting Jamestown to a portion of Newport. The legislative decision to link Jamestown with Newport was based on legitimate factors and was clearly not irrational. That decision will not be disturbed by this court.

 Although the shape of the Newport section of district 98 may be odd, it appears that the "hook section" of district 98—which plaintiffs point to as evidence of noncompactness—was drawn to create additional contiguity with Jamestown. We make no judgment about whether the addition was required in order to establish contiguity between the two portions of the district. District 98 is contiguous because the Newport Bridge connects both the

Newport and the Jamestown portions of the district without crossing land of any other district. Rhode Island's unique geographic features make compliance with the compactness requirement difficult at times. We do not wish to lessen the importance of this constitutional mandate, but we find that the addition by the Legislature of a small amount of shoreline to district 98 to ensure that the contiguous requirement was met does not present a violation of the constitutional requirement that districts be as compact as possible.

## III

### EQUAL PROTECTION

The trial justice made the following findings of fact: the ideal House District should contain 9,472 residents; the total maximum deviation of the House plan is 11.5 percent, the average deviation is 1.9 percent, and the median deviation is 2.1 percent; a mathematical error occurred in computing districts 24 and 25, causing district 24 to be 5.83 percent above the ideal district size and district 25 to be 5.68 percent below the ideal; the total deviation of the entire plan absent districts 24 and 25 would be 5.4 percent. Each of these facts is important in a determination of whether the House reapportionment plan as a whole violates plaintiffs' constitutional right to equal protection.

The Constitution of the United States protects the right of all qualified citizens to vote, *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884), and to have their votes counted. *United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355 (1915). As the Court stated in *Gray v. Sanders*, 372 U.S. 368, 379–81, 83 S.Ct. 801, 808–09, 9 L.Ed.2d 821, 830–31 (1963):

"The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our

decisions. * * * The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

■ Our focus "must be concentrated upon ascertaining whether there has been any discrimination against certain of the State's citizens which constitutes an impermissible impairment of their constitutionally protected right to vote." *Reynolds v. Sims*, 377 U.S. 533, 561, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 *reh. denied*, 379 U.S. 870, 85 S.Ct. 12, 13 L.Ed.2d 76 (1964).

The plaintiffs assert that the total maximum deviation of 11.5 percent represents a prima facie case of the unconstitutionality of the plan, requiring the state to justify the deviation in order for the entire plan to withstand the constitutional challenge. Our reading of the applicable U.S. Supreme Court cases (*See, e.g., Brown v. Thomson*, —— U.S. ——, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983)) would lead us to agree with this conclusion were it not for the other unique factors present in this case.

We do not believe that the problem before us lends itself to any "uniform formula, and it is neither practicable nor desirable to establish rigid mathematical standards for evaluating the constitutional validity of a state legislative apportionment scheme under the Equal Protection Clause." *Roman v. Sincock*, 377 U.S. 695, 710, 84 S.Ct. 1449, 1458, 12 L.Ed.2d 620, 630 (1964). "In any event, the fact that a 10% or 15% variation from the norm is approved [or disapproved] in one State has little bearing on the validity of a similar variation in another State." *Swann v. Adams*, 385 U.S. 440, 445, 87 S.Ct. 569, 572, 17 L.Ed.2d 501, 505 (1967).

As the U.S. Supreme Court stated in *Reynolds v. Sims*, 377 U.S. at 578, 84 S.Ct. at 1390, 12 L.Ed.2d at 537:

"Developing a body of doctrine on a case-by-case basis appears to us to provide the most satisfactory means of arriving at

detailed constitutional requirements in the area of state legislative apportionment. *Cf. Slaughter-House Cases,* 16 Wall. 36, 78–79 [21 L.Ed. 394]."

The trial justice found that a "mathematical error" resulted in such large deviations from the ideal district size in districts 24 and 25. Other than this deviation in these two districts, the House plan has a total deviation of 5.4 percent. It is clear that a 5.4 percent total deviation, absent a showing of bad-faith actions, would be a "relatively minor population deviation[ ]," *White v. Regester,* 412 U.S. 755, 764, 93 S.Ct. 2332, 2338, 37 L.Ed.2d 314, 323 (1973), and therefore not be deemed to deny any citizens their constitutional rights.

The plan contains an average deviation of only 1.9 percent and a median deviation of 2.1 percent. Without the overly populated district 24 (5.827 percent above the ideal) and the underpopulated district 25 (5.679 percent below the ideal), the total deviation of the entire plan would be 5.4 percent—clearly prima facie constitutional. These facts persuade us that the House plan as a whole adequately protects the people of this state in their constitutional right to one person, one vote.

■ We cannot, however, allow the large disparity between districts 24 and 25 to exist. The United States Supreme Court has clearly held that a deviation of greater than 10 percent is prima facie unconstitutional and requires a showing of legitimate state purpose. *Brown v. Thomson,* —— U.S. at ——, 103 S.Ct. at 2696, 77 L.Ed.2d at 221–22. The difference between districts 24 and 25 is 11.5 percent. The trial court found that this discrepancy was due to a mathematical error. This does not represent a legitimate state purpose—it is merely an explanation. We need not and do not find the entire plan invalid in order to correct this disparity. To discard a reapportionment plan that in all other respects

is constitutionally adequate would be a tremendous waste. We therefore direct the Superior Court to enjoin implementation of the plan in respect to districts 24 and 25 unless and until the General Assembly corrects the disparity before the next general election in order to ensure that the voting rights of the citizens of these districts are not diluted.[13]

For the reasons given, the plaintiffs' appeal is sustained in regard to districts 24 and 25. The appeal is otherwise denied. The judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court with directions to enter judgment in accordance with this opinion.

KELLEHER, Justice, concurring.

I concur with all of the conclusions reached by my colleagues, but I see no necessity for reaching the question of institutional privilege. A decision based upon a constitutional determination should be avoided whenever it is possible to determine the issue on other grounds. *Chartier Real Estate Co. v. Chafee,* 101 R.I. 544, 556, 225 A.2d 766, 773 (1967). The trial justice, in refusing to allow Senator Sapinsley to testify about her experience as a member of the Reapportionment Commission and in rejecting the plaintiffs' effort to have the Speaker of the House and two members of the commission give similar testimony, rested his decision on two grounds: relevancy and the institutional privilege. I am of the firm belief that, for the reasons that follow, the testimony sought from the senator, the speaker, and the two commission members was totally irrelevant. Consequently, I affirm the trial justice's evidentiary rulings on that ground and leave the institutional-privilege question to another day.

There can be little doubt that a valid exercise of legislative power, whether on the federal or the state level, will not be

---

**13.** The court has become aware that an act that appears to address the disparity between the two districts has passed the General Assembly and has become law without the signature of the Governor. This may constitute compliance with our mandate herein. However, this issue would be resolved properly in the Superior Court to which this case is remanded.

invalidated because certain legislators may have had invalid motives when the legislation in question was enacted. Legislators with evil motives can be part of a group that passes sound legislation, whereas legislators who have been motivated by the purest of intentions have been known to adopt legislation that has failed to pass constitutional muster.

As long ago as 1810, the United States Supreme Court in *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), had this to say about inquiry into legislative motivation:

> "If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law." *Id.* at 131.

During the ensuing years the Supreme Court has had several opportunities to reconsider this doctrine, but it has been forceful in upholding it. As the Supreme Court stated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), *reh. denied,* 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968), "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork." *Id.* 391 U.S. at 384, 88 S.Ct. at 1683, 20 L.Ed.2d at 684. Later, in *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 508, 95 S.Ct. 1813, 1824, 44 L.Ed.2d 324, 339 (1975), the Court once again emphasized that in determining the legitimacy of a congressional act, it would not look at the motives alleged to have prompted it. Similar sentiments were expressed by our predecessors in *Gorham v. Robinson,* 57 R.I. 1, 8, 186 A. 832, 838 (1936).

Indeed, the guesswork alluded to in *O'Brien* would, in all probability, be futile. If the law is struck down because of what less than a handful of legislators said about it, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons." *Palmer v. Thompson,* 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, 445 (1970).

Consequently, since it is beyond the power of the judiciary to hypothesize about legislators' motivations, the judiciary is obligated to evaluate the legislative work product in the light of settled legal principles. The question is, What has the Legislature actually done? and not, Why has it done so? *Daniel v. Family Security Life Insurance Co.,* 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632, 636 (1949); *United States v. Des Moines Navigation and Railway Co.,* 142 U.S. 510, 544, 12 S.Ct. 308, 318, 35 L.Ed. 1099, 1109 (1892); *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 19 L.Ed. 264 (1869). Thus, if what the Legislature has done is constitutional, the reasons why it has done so are irrelevant, *Bullock v. Washington,* 468 F.2d 1096, 1102 (D.C.Cir.1972), and as noted earlier by my Brother Shea, the House reapportionment plan satisfies all relevant constitutional mandates, whether federal or state.